Okay, we're back in and it's time for Great Basin Mine Watch v. Hankins. Councilor Eddy? Thank you, Your Honors, and good morning. My name is Roger Flynn, and I represent Great Basin Mine Watch and the Mineral Policy Center. And with me is Nicole Rinke, who runs our Nevada office in Reno. There are many issues in this case, but at its core, it is water. The statutes Congress passed to protect that water, particularly in the arid western public lands. Nevada is the driest state in the Union. And Newmont proposes here, as BLM has approved, the removal of the aquifer of literally billions of gallons of water out of the Tuscarora Mountains. We argue that the BLM has a duty under the Clean Water Act and the Federal Land Policy Management Act, or FLPMA, to protect water quality and the loss of water flows from degradation or loss by mining companies and mining operations on public lands. Now, there's two Clean Water Act main issues here. One has to do with the dewatering of the streams and the springs. And the other has to do with Newmont's pumping of the water that it pumps out of the ground to free up and dry up the mine zone into Lower Maggie Creek. And that water, as the record shows, has a number of pollution problems. So that's the second Clean Water Act issue. The first one is the dewatering. So I wanted to focus on that first because it really is, we think, the most important issue going on right now in north-central Nevada is the dewatering of these aquifers by the big open pools on BLM land. The Clean Water Act, particularly the PUD number one case, says that you have to protect water quality standards. And water quality standards aren't just milligrams per liter of arsenic. The PUD case, Justice O'Connor said, that water quality includes the maintenance of existing stream flows and protecting those designated uses. The designated uses here in the streams in the Tuscarora Mountains are for aquatic life and for human recreation. So we feel that when you lower the water, and some of these streams are going to dry up for all the year, part of the year, depends on the stream, its elevation, and things like that, that that violates the Clean Water Act because the designated uses for fish and aquatic life, fish can't live in a dried up stream. So we feel that that's a violation of the Clean Water Act. The other part of the Clean Water Act that is even more specific is the anti-degradation provisions. And the PUD case talked about this, the Idaho Sporting Congress case in the Ninth Circuit, says that under Section 313 of the Clean Water Act and the anti-degradation provisions, you have to, quote, from the regulation, that water quality must, quote, be maintained and protected. So water quality means protecting the flows for existing uses, designated uses. Those flows and those uses have to be maintained and protected. No degradation, not for a few months, not for until our mitigation plan comes online in a few years after we notice that the streams are starting to drop. No degradation at no time. It's an anti-degradation, not a some degradation or a temporal degradation. You just can't have degradation. Now the main defenses from BLM and Newmont, and this started at the beginning of the permitting process, if you look at the comments back and forth from Great Basin and Mineral Policy Center, was that the Clean Water Act does not apply here because Newmont has been granted state-issued water rights from the state of Nevada, state engineer, to pump these billions of gallons of water out, and therefore, essentially, that the issuance of the state water rights trumps the federal government's responsibilities under the Clean Water Act and FLTMA. I think that is wrong, and the district court relied on this, too. That is wrong as a matter of Supreme Court and Ninth Circuit case law. The PUD case specifically looked at that issue and said, the Clean Water Act is not trumped by the issuance of state water rights. Just recently, in this circuit, the County of Okanagan case versus National Marine Fisheries Service, that issue was raised by the irrigators in that case, that, hey, we have a state-issued water right. Forest Service, you can't meet your duty to protect fisheries and water flows because that would impact our state-issued water rights. The County of Okanagan case specifically said no. Federal Clean Water Act, and that case was also Endangered Species Act, and FLTMA, as mentioned in that case, are supreme, the supremacy clause, the property clause, and they trump the issuance of the state water rights rather than the other way around. That was the first main defense that started from the get-go in the permitting. The second was that while the Clean Water Act doesn't apply to the lowering of the water, you know, the drying up of these streams for part of the year or all the year, because Newmont, except for down in Lower Maggie Creek where they're dumping the water out, all up there in the mountains, they're not discharging. They're not adding any pollutants into all of these streams that are going dry. And we think that the Ninth Circuit case law is not limited, does not just limit the Clean Water Act's applicability just to discharges. For example, the recent case from the Ninth Circuit that we cited, the National Wildlife Federation v. Army Corps of Engineers case, had to do with the Army Corps of Engineers' operation of dams on the Snake River in Oregon, and the conservation groups had argued, no, wait a minute, the water behind the dams is warming up. You can't allow, in violation of Oregon's temperature standard, you can't allow the water to warm up in violation of the standard. There was no discharge into the lakes behind the dams. It just had to do with the fact that water standards were being violated by what the federal government was doing in that case. So the water quality issue was because the state of Oregon had a statute that was being violated. Right. How the Clean Water Works was, the federal government is the primary responsibility for the Clean Water Act, and it delegates to the various states, Oregon, Nevada, to establish water quality standards. And those water quality standards, the goal of the Clean Water Act, is to protect, to make the streams fishable and swimmable. So they set up standards that need to be protected. The state may control it. It's been delegated to the state. The state may control it. If Nevada chooses not to control it, what then? Well, Nevada has standards here for the streams. These streams in the Tuscarora Mountains are for aquatic life and recreation. So the stream standards are there. But the standards for minimum water flow are not there in Nevada. Well, there's not a standard for minimum water flow, for example, 5 cubic feet per second. For any water flow, the water quality involved here that you're talking about, minimum water flow, has been delegated to the state. Nevada has chosen not to regulate. Doesn't that mean that there's no violation? There's no violation because there's no standard set by Nevada. No, there is a standard. The standard is to protect aquatic life. Nevada has been delegated the discharge permit program, for example, the discharge into Lower Maggie Creek. That's what Nevada has delegated to have, a permit program. The BLM regulations, under the mining regulations, say you can't violate water quality standards. The Clean Water Act says you can't violate water standards. If you say to Nevada, you're going to determine what the water quality is. Right. And they choose that water quality has nothing to do with minimum water flow, then that's part of the federalism makeup of the statute. We're allowing the states to do it. That was the big fight on Capitol Hill. The local people wanted to have more control because they knew water better than the people in Washington, D.C., not a rational decision. So Nevada decides they don't want to control this. Isn't that in keeping with the federalism aspect of the statute? If Nevada eliminated the water quality standards for aquatic life and recreation in the Tuscarora Mountains, then that would be correct. And Nevada says we don't have standards up there anymore that need to be protected. There are standards there. Nevada hasn't said there's no standards up there. And the question is, what is protection of the anti-degradation rule? You can't degrade water quality. And the Supreme Court said water quality means protect those uses. Nevada still has those uses on those streams. They haven't said, well, in the mining regions of north central Nevada, we'll just not worry about aquatic life. We'll remove those standards. States have done that. They've taken out the relaxed standards. Again, the standard isn't, you know, the level of arsenic in the water in this case. It's the level of existing uses that need to be maintained and protected. The issue, I think there's a side issue that no party briefed in this case, but there was a recent Ninth Circuit case a couple of years ago called Northern Plains Resource Council versus Fidelity Investments. And that was a case where some oil and gas operators were taking pumped water and dumping it in the stream. And Nevada, excuse me, Montana, the state of Montana, delegated under the Clean Water Act said, well, we're not going to require the water quality standards and we're not going to require permitting issues to be met in that case. And the Ninth Circuit said, no, only Congress can change the Clean Water Act. Only Congress can take away the requirement to meet existing uses and meet the Clean Water Act. And they said Nevada, in that case Montana, does not have the opportunity to waive the Clean Water Act. And here they haven't done no such thing. All that Nevada says is we've given them a state engineer's permit. That's good enough for us. We don't look at flows. But just because Nevada doesn't want to look at the flow issue doesn't mean that the water quality standards are met. Remember that water quality standard is the maintenance of existing flow levels. And that's what's being violated here. They are dropping. So you've argued that this Court shouldn't allow the Nevada regulatory approval of the dewatering involved here to trump the Clean Water Act. That's part of your argument, isn't it? Yes, sir. At a level below that, does that mean we shouldn't take into consideration that approval? Well, it's part of the, for example, if the BLM, if the company had no water rights to do any of this, I think the BLM could legitimately go to the company and say, well, where's your water right to do this? You don't have authority from Nevada to do it. But just because Nevada, under its separate system, completely separate water quantity system, has allowed it, again, doesn't trump the Clean Water Act issues. You consider it, but again, when you come to a supremacy clause and a property clause analysis, the courts in the Supreme Court and the Ninth Circuit in particular have said the state water rights don't rise to the level of overriding the duties under environmental and public land law. Can we take into consideration, in the overall consideration of the issue before us, that the state regulatory authorities authorized the dewatering involved here and that, as far as we can tell from the record, they've not exceeded the permit or violated the permit that allowed the dewatering? Right. As far as I know, they haven't dewatered more than they're allowed. But the state engineer system in Nevada, which is a strictly quantity system, it says we have water rights for irrigation and municipal use and everything like that, and mining is a recognized use. The state has allowed them to take out such thousands and thousands of gallons a minute, and that's where their analysis stops. The state engineer doesn't determine, well, what is the effect on aquatic life? What is the effect on recreation? We're just basically, if you know from state water law and the prior appropriation doctrine in the West, is does that use, is there enough water compared to other water users in the area? And the state of Nevada said yes. Most of the arid states in the West, I'm not intimately familiar with Nevada, I'm from Arizona, have adopted pretty strict regulatory schemes to get away from prior appropriation and the old notion that you could use, as long as you have the water on your property, you could use it any way you want to. We may have been slow to the game, but we recognize it's a limited resource. Well, that's right. The use it or lose it requirement under state water law still applies in Nevada and Arizona and Colorado and elsewhere. It's just the fact, here again, that the BLM, that the state of Nevada has authorized it to pump such an amount of water with no consideration of the Environmental Impacts or the Clean Water Act standards. That doesn't override the requirements. The other statute dealing with water flows is FLPMA. The FLPMA requires the BLM to prevent unnecessary and particularly undue degradation of the public land resources. And in the BLM Mining Regulations of 43 CFR Part 3809, it says, undue degradation is defined in part as a number of definitions as violating federal or state environmental requirements, environmental laws. For example, even leaving aside the question about state systems, the federal EPA anti-degradation requirement is a federal requirement. So leaving aside all of Nevada's requirements on water quality, the federal regulations require anti-degradation, and there's no degradation. So under the FLPMA Mining Regulations, BLM also cannot reduce flows. And the other issue with flows, and this came up in the arguments over standing and waiver and exhaustion and a lot of the briefing on that, is we had argued under FLPMA the loss of the Federal Reserve water rights in the Tuscarora Mountains is undue degradation. It's tied to the flows, but it really is a FLPMA issue more than a Clean Water Act issue because the federal government has Federal Reserve water rights. And in the West, a Federal Reserve water right is very valued. Any water right is valued in the arid West, but a Federal Reserve water right is a critical issue. And we argue that they have not really looked and prevented the undue degradation of these Federal Reserve water rights. I have about a half a minute before I go to break for a rebuttal. I just wanted to talk about the pumping discharges. This was the dewatering issues. This is actually they're going to take those billions of gallons and dump it into Lower Maggie Creek. The only evidence in the record that we have is from 1994 to 1998. These EISs came out in about 2002. It shows that that water is going to violate standards. It has for some of these parameters 50% of the time. That water is violating state of Nevada standards, which under the Clean Water Act and the BLM regs they can't do. Their answer is, well, that's stale data, or Nevada has allowed it. And with all due respect to Nevada, if Nevada allows a discharge but they're not enforcing it, BLM is not absolved of its responsibility to say, wait a minute, your pumped water is going to violate the stream standards in Maggie Creek and the Humboldt River. We're not going to allow that. And the district court adopted BLM and Newmont's argument that, well, as long as there's general compliance, 50% permit exceedances on the record, that's okay as long as there's general compliance. There's nothing in the Clean Water Act that says you can violate things 50% of the time. There's no general compliance. It's strict compliance at all times, and that is not going to happen here. The mitigation plan is going to take years to develop, and the water quality is going to start going down soon after the watering stops, and that's our primary concern. I know there's a number of other issues here that we've all briefed, and I'd like to save the remaining time for my rebuttal. Thank you very much. Counsel? May it please the Court. I'm John Arbab on behalf of the Federal Appellees. With me at the counsel table is Scott Hart, representing the intervener in Newmont. I'd like to argue for about 12 minutes, leaving about eight minutes for Mr. Hart's presentation. I think it would help to get a bit of a perspective on what this case is all about. After about five years of planning and study and the compilation of voluminous administrative record, which contains some 687 reports alone, and after extensive public participation, including the appellants, BLM prepared environmental impact statements and approved the SOPA and Leeville projects. In their respective records of decision, BLM made a finding that the projects, as modified by mitigation plans and additional mitigating measures specified in the rods, quote, will not cause unnecessary or undue degradation of the public lands, unquote. This can be found in the records of decision at excerpts of record 282 and 356, that's appellants' excerpts of record. Now, as I see it, Great Basin's burden is to demonstrate that this finding is arbitrary and capricious under the Administrative Procedure Act. I submit that Great Basin has failed to demonstrate that in reaching those decisions, BLM acted arbitrarily or capriciously. Great Basin has not carried its burden of showing that BLM relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. These are the standards that the Court has explained govern the arbitrary or capricious level of review in the appellate courts. There's one part of the environmental impact statement that gives me concern, and I'd like to have your response to it, and that has to do with cumulative impacts. You're familiar with that part of the environmental impact statement? Yes, Your Honor. It lists four areas of cumulative impact, and one of them is the surrounding property, and the environmental impact statement lists the property. The attack on that is that there's not enough detail. That is, just listing the property isn't enough. There must be some additional description so that a determination can be made under review as to whether or not there's an impact. Your opposition indicates, and it seems to me with pretty good reason, that there is insufficient detail. How would you respond to that? Well, Your Honor, there are some cumulative impact claims that we believe have been waived. Those are specifically three, cumulative impact claims relating to the so-called peat project, cumulative impact claims relating to the discharge of Leeville's groundwater to Barrick's existing water management system, and thirdly, the disposal of Leeville's sludge. Now, I believe, Your Honor, your question was probably going to the specific objection about the allegedly inadequate treatment of the peat project. We believe that that issue is waived because it was not raised before BLM. Would you mind addressing the merits on all those? I think that was Judge Wallace's questions. I know your position is that they waive that, but I'm interested in your view. Yes, Your Honor. I just wanted the Court to be clear that we do believe that there was a waiver. As to the peat project, the peat project is included in the SOPA and Leeville cumulative impact analysis. The acreage of expected mine disturbance is accounted for. It's implicitly and explicitly included in the non-dewatering resource category discussions. Now, I suppose you could argue about what level of detail is necessary or sufficient to satisfy the appellants, but I believe that the degree to which the peat project was handled was sufficient to constitute an adequate cumulative impact analysis. How many mines are there in the area? I believe there are roughly 40 or so, Your Honor. And how much detail are you required to go into as to whether or not this particular project will add to what all the other 40 mines are doing as far as creating a cumulative impact which is unacceptable? Well, the cumulative impact focuses on the incremental impact of the particular decision, the particular plan of operations under review, and there would need to be a discussion of how that incremental impact plays out. And I believe that the chapters on cumulative impacts, both in the SOPA and in the Leeville environmental impact statements, cover that subject. Do you think it's adequate? They do not. They said it's not detailed enough. Well, I think the question is, has the agency provided a reasonable analysis of cumulative impacts? And it's always possible to quarrel about the level of detail and to demand more, but I think that's the sort of improper fly-specking that the law is quite clear. Plaintiffs should not be able to deploy against well-thought-out NEPA documents. The other area in that part of the environmental impact statement I'm concerned about is the Leesville's groundwater issue. It seems to me that that does create some difficulties for the administration. How do you respond to the attacks made by your opposition on that issue? Well, Your Honor, the Leesville draft EIS considered the discharge of water from Leesville to Barrick's system. The Leesville draft EIS did not specifically deal with that as a cumulative impact, but that is because it was not raised in that context. The Leesville draft EIS is quite clear, though, that it describes what will happen to the groundwater. It will first be treated at Newmont's water treatment facility to meet state standards. Then it's discharged to Barrick's pipeline and canal system. From there, the water is distributed to a body of water called the T.S. Ranch Reservoir, to other infiltration basins used for irrigation or, if necessary, discharged to the Humboldt River upon approval of the state engineer. The Leesville draft EIS describes all of this and comes to the conclusion that no impacts to surface water quality would occur. That can be found at Newmont's excerpts of record, page 541. So I guess the short answer to your question, Judge Wallace, is that to the extent this issue was raised, the draft EIS for Leesville quite adequately covers it and explains how that water is going to be handled and that there won't be impacts to surface water quality. Okay, let me get your response to one other area, and that has to do with this number 107 that was signed in 1926 by a president. Yes. The district court, as I recall, decided that any claim under that's been waived. That is not properly raised. If, in fact, the issue involved is the water around, and there's an executive order talking about the elimination of area springs and water holes, and assuming the standing question, let's not get into that. Was it, in fact, waived? Yes, Your Honor. We agree with the district court's waiver finding on that point. Great Basin even admits in its briefs here that it did not mention PWR 107 by name before BLM. And our point on waiver is that general comments about damage to the aquifer or the local aquifer or general references to those sorts of water sources does not preserve a specific PWR 107 claim. I guess the argument is that a government agency should be on notice of anything the government has done. I understand that's a little difficult with the size of our government, but I guess the argument is that any time the President of the United States, who heads the administration, puts in an executive order, that all of the agencies either know about it or should know about it. The waiver of the district judge seems to go more to the idea, well, you didn't give me the exact name. You were talking in generalities. But shouldn't the agencies be on notice of what the federal government has done through its commander in chief? Well, Your Honor, I think it's true that agencies must follow their regulations and executive orders and statutes. But here you're dealing with a very complex system of water sources spread out over a very large area. And to the extent that someone believes that there has been harm or will be harm caused to a certain type of water resource, I think at minimum the party must come forward to BLM and say, look, we're concerned about the impact to water sources that have been reserved by this 1926 executive order. Please analyze this situation further. Here are the ones we believe are going to be impacted. None of that happened. And I think the district court was just saying, look, it's not fair to the agency to, after all the analysis has been done, to say, aha, you didn't look at PWR 107 springs and seeps when that claim was just not raised at the appropriate time before the agency. Is 107 really relevant to the issue? Well, it's one of the issues that Great Basin has been pressing. I understand. But 107, according to two cases, whether that's true or not, according to two cases, 107 was the purpose of keeping builders from monopolizing water. That's not the case here. We don't have any builders involved. And I just wondered whether it had relevance, that particular 107, has relevance to what we're doing here because it was for an entirely different purpose. I don't know. Was that raised at all? I don't believe so, Your Honor. And I do think that whether the issue was waived or not, BLM did discharge its obligation, as you stated earlier, to make sure that what it was doing was in compliance with outstanding executive orders and laws. BLM carefully identified and mapped the springs and seeps that could potentially be affected by SOPA's dewatering. And BLM specified the method of mitigation that Newmont would be required to use were a loss of flow actually documented during the extensive monitoring that is provided for in the mitigation plans. And BLM went so far as to note that this group of springs includes PWR 107 springs located near James Creek and separate PWR 107 springs that flow to James Creek. This can be found at Newmont's excerpts of record, page 1003. The inventory numbers are called JC2 and Spring 21. It's in the form of a chart, and there's a notation with respect to those particular springs that they are PWR water bodies. So I think that if the issue is not waived, it's clearly not a basis for objecting to what BLM has done here because BLM has demonstrated that even though the claim wasn't brought to its attention, it nonetheless took care to make sure that PWR 107 springs were accounted for in its analysis. I believe that – oh, I see that I've gone a little bit over the time that I intended. Yes, I don't want to deprive Mr. Hart of his opportunity. Thank you. Thank you for your argument. Counsel? Good afternoon, Your Honors. My name is Scott Hart. I'm here on behalf of Newmont Mining Corporation, and I'm subject to any questions from the panel. I'd like to start out addressing some of the dewatering issues that Mr. Flynn raised and then maybe follow up on some of the cumulative impact discussions that were being had with Mr. Arbab. On Great Basin Mine Watch's claim that the BLM somehow failed to ensure that Nevada water quality standards are being protected, the starting place for analyzing that issue should be the record. This is obviously an APA review case. And what the district court held on that claim was that the BLM did conduct a comprehensive analysis of potential impacts to beneficial uses in streams that may have dewatering impacts and reasonably concluded that the beneficial uses of those streams would be protected and that there would be no unnecessary and undue degradation. And Great Basin Mine Watch has failed to offer any facts, any evidence, any support whatsoever that would be sufficient to meet their burden to demonstrate that that determination was arbitrary and capricious. And I understand that the panel has read the record. I just want to hit a couple of highlights in the record in terms of the basis for the BLM's determination that there would be no unnecessary and undue degradation from dewatering. The starting point for the BLM's analysis was an EIS that was done back in 1993 when dewatering was first authorized. And there was a comprehensive, more than 90-page mitigation plan that was prepared at that time. And that appears in the record at Newmont Excerpts of Record, page 112. Very important document because it's a critical component of the BLM's analysis. What the BLM found when it was getting ready to consider Levo and SOPA, the 2002 rods, is it looked at what had happened since 1993. And lo and behold, since dewatering had started, there had been no adverse impacts to stream flows, contrary to what had been projected, demonstrating that the modeling had been overly conservative, and also concluded that there had actually been substantial improvements to aquatic habitat. And I'd like to refer the court specifically to Appendix A to the SOPA Final Environmental Impact Statement. And that's at Newmont's Excerpt of Record 997. And it's a technical report, but there's also some very striking photographs there that show before and after conditions of various streams that would be potentially impacted by dewatering that clearly, even to a layman's eye, show very substantial improvement, both in terms of increased depth-to-width ratio, so we have less evaporation, less infiltration, lower temperatures, which is what BLM specifically found in the 1993 mitigation plan, that this kind of habitat enhancement that was required in 1993 would actually lower temperatures, not raise them, contrary to Great Basin Mine Watch's allegation, and also shows very enhanced riparian vegetation. Looking ahead, then, to what was going to happen with Leeville and SOPA, BLM prepared very comprehensive cumulative impact analysis of dewatering impacts, and that culminated in the 300-page cumulative impact assessment. There's just excerpts of it in the record, but it's a very significant document, went into a lot of detail, complex modeling of groundwater drawdown, hydrological connection to various seeps, springs, and streams, and projected potential impacts. That document was incorporated by reference and discussed in both Leeville and SOPA EIS. What that document showed is that there would, in fact, be very few additional stream segments that would potentially be impacted by SOPA and Leeville. In fact, there is an extensive amount of dewatering that's been going on out there for years, primarily with respect to the Gold Strike Mine, which is a third-party mine, not at issue here, and the dewatering related to these projects was, for the most part, going to be within the drawdown cone that already existed from the prior mines. So, again, not dozens and dozens of streams are going to be potentially impacted here. It's a very limited number of streams. What BLM then did is looked at the adaptability of the organisms that inhabit these ephemeral streams, concluded that these organisms are already adapted to periodic dry periods and, therefore, could withstand some changes in flow. But then, most importantly, BLM went back to the 1993 mitigation plan and modified that plan to incorporate additional requirements to address any incremental impacts from SOPA and Leeville. And just very briefly on the mitigation plan, because that plan's been very mischaracterized in the briefs, that is a multi-step mitigation plan. It's not simply a question of, well, if the streams dry up, Newmont's going to somehow put some water in the streams. It's much more detailed than that, and the primary mitigation measure set out in that plan is actually these habitat enhancement measures that I was referencing earlier. In fact, 82 miles of stream channels required to be improved, 1,982.8 acres of riparian wetland habitat is required to be improved, and BLM specifically found that those measures would, in fact, offset any potential impacts of dewatering. Again, because of increased shading, increased depth-to-width ratio, less evaporation, less infiltration. That's the primary mitigation measure. As a safety net, BLM required very comprehensive monitoring that's discussed in the briefs and required, in addition, an augmentation requirement that even if this habitat enhancement work does not pan out to fully mitigate, then Newmont does, in fact, have to come in and mitigate with actual stream flow augmentation. And that's probably enough on that. I'd like to talk briefly about the legal issue that's been raised in connection with dewatering. Neither BLM nor Newmont are arguing that the BLM is powerless to require mitigation that may impair state-granted water rights. The Okanagan case is absolutely not at issue here. In fact, as I just discussed in the mitigation plan, BLM has required numerous mitigation measures that dramatically affect Newmont's exercise of state-granted water rights. The only legal issue here, and the court doesn't even need to reach it again, the district court made its finding based on a factual review of the record. The only legal issue is that the specific Nevada water quality standards that Great Basin Mine Launch relies on, the beneficial use designation, and the temperature water quality standard do not apply to water withdrawals. And let me just, I know my time's running out quickly, let me give you two citations that I would ask the court to review. These are Nevada Administrative Code sections. The first one is Nevada Administrative Code 445A.122 subpart 1. That's the beneficial use designation for aquatic life. Very specifically in the text of that regulation states that the beneficial use designations in Nevada quote, must not be used to prohibit the use of water as authorized, end of quote, by the state engineer. Similarly, if you look at the temperature standard that Great Basin Mine Launch relies on, that's Nevada Administrative Code 445A.121 subpart 4. Again, that talks about waters being free from high temperatures, quote, attributable to domestic or industrial waste or other controllable sources, end of quote. It has nothing to do with dewatering. In contrast to the Washington cases, the National Wildlife Federation case, the dam case that Mr. Flynn was referring to that relies on Washington water quality standards, if you take a look at the Washington water quality standard issue in that case, it specifically talks about high temperatures resulting from any human activities. So again, it might sound like splitting hairs, but the point is what PUD number one held was that states have authority to adopt water quality standards that may require in-stream flows. It did not say they had to. In fact, the only case addressing that issue is the Colorado wild case out of the Federal District Court in Colorado. They looked at the state of Colorado water quality standards that are almost identical to Nevada standards and held that those standards did not restrict water usage. Okay. Thank you for your argument. Rebuttal. Thank you, Your Honors. I'll start to work out from the back. Regarding the state of Nevada saying that the BLM is not responsible for protecting existing uses, like I said, the state of Nevada cannot override the BLM's duties under the Clean Water Act to protect existing uses, let alone the federal regulatory anti-degradation requirement that was at issue in Idaho's Boarding Congress and other states. So the fact that Nevada itself is okay with dewatering of streams does not mean that BLM is. The Clean Water Act is a federal statute. Some of these issues dealing with the cumulative impacts that Your Honor talked about, essentially what's happening here is a death by 1,000 cuts. We talk about outside of the groundwater model, which is a cumulative impact model, everything else is essentially a list of the acreages of 40-plus mines in there, 40 mines. Is there any mention of the peat mine and its impacts? No. Do we even know what the peat mine looks like if you look at the EIS? No. Do we even know what the barrack mine looks like except for some of the water distribution systems? No. Do we know anything about the sludge, the sludge that's going to come from the Leeville treatment up to the Newmont's North operations? No. There's no mention of these mines and their specific impacts. I think the Ninth Circuit in the last couple of years has really clarified cumulative impacts, and you go to the Klamath-Siskey case and the Lands Council case that we cited in our reply brief and our opening brief. That is the Ninth Circuit law on cumulative impacts. You just can't list acreage and say, well, there's a lot of mines up there, and the soils and the recreation and the Native Americans are all going to be impacted, and that's issue. That's not what the Ninth Circuit test is for cumulative impacts. One of the issues on waiver is, frankly, the issue on waiver is, is the public cares about the resource and protecting the resource. Great Basin Mine Watch is a citizen's organization made up of ranchers, Native American, and conservation groups in rural Nevada, and they're not experts in the executive orders of Cal Coolidge. What they care about is the resource and the loss of these flows. And they said, BLM, you have a duty to protect these flows. And BLM's response is, well, we didn't know we had this executive order, and they came up with something in the record that said, well, there's three of them out there. But if you see the supplemental excerpt of record when we cite the maps and the text in the BLM's document, there's 182 springs that are within the drawdown area, 182. And they just said, oh, there's three are going to be subject to the PWR. Remember, the PWR issue is under FLTMA, which FLTMA says the BLM has to prevent undue degradation, very strict standard, undue degradation of loss of public land resources, and that a Federal Reserve water right is one of the paramount public land resources in the Arid West, in a state like Nevada particularly. So the issue was raised, not waived. Did we cite chapter and verse of the statutes? No. Does the Ninth Circuit require you to list all of the legal sources of the flows? No. It says to the public you're concerned about the flows. And some of the waiver issues on the cumulative impacts issue, for example, if you look at ER at 133, the BLM said these are some of the issues that the public is concerned about. Quote, potential cumulative impacts of past and anticipated mine expansions within the BLM Elko area in the Humboldt National Forest. How more clear could you be? We also, in our opening brief at page 60, citing the ER at 190, Mineral Policy Center specifically said the Carlin trend here, the Tuscarora Mountains are being deluged by new mining operations and expansions of mining operations. BLM should look at these in one comprehensive environmental review, and they can't chop it up into individual EISs, let alone the fact that we didn't even get into the connected actions argument where all the ore from Levo has to be processed down to SOPA or it's all over and Levo can't even operate. So these are some of the waiver issues and cumulative impact issues. The last thing on the public water reserve, is it relevant or not? And they said, well, it's only developers. Now, if you look at our site in our opening brief of the Desert Survivors case, where the Interior Department cites some of the old PWR cases and says it actually upheld a citizen challenge to mine dewatering that would impact the PWR 107 cases. So BLM was aware. It's own case law says they have to protect PWR from mining impacts, and they didn't do that in this case. I see my time's up, but if there are any final questions. I don't see any. Thank you very much for your argument. Thank everyone for their arguments. It's a very interesting, challenging case. Thank you very much. It's now submitted for decision.
judges: Wallace, Hawkins, Thomas